IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Welfare of | ) | |
| | ) | No. 40423-4-III |
| I.A.L. and L.J. | ) | (Consolidated with |
| | ) | No. 40424-2-III) |
| | ) | |
| | ) | UNPUBLISHED OPINION |

STAAB, A.C.J. — The trial court terminated the parent-child relationship between A.B. (the mother) and her children, I.L. and L.J., finding that the Department of Children, Youth, and Families (Department) made reasonable efforts to determine the mother's needs and that all necessary and court-ordered services were either offered or provided. On appeal, the mother challenges several of the court's findings, arguing they are not supported by substantial evidence. Additionally, she contends that the Department failed to provide timely and tailored mental health services.

Although we agree that some of the challenged findings are unsupported, the trial court's ultimate conclusion that necessary services were offered is supported by the remaining findings. As such, we affirm the termination of the mother's parental rights.

BACKGROUND

A.B. is the mother of I.L. and L.J.

I.L. was born on July 9, 2019. At the time of his birth, the mother tested positive for methamphetamine and I.L.'s umbilical cord indicated in utero exposure to methamphetamine. I.L. was removed from his parents' care in November 2019 after he sustained a rib fracture during a domestic violence dispute between his parents. The following year, in January 2020, the mother agreed to orders of dependency and disposition as to I.L. I.L. was returned to his mother's care in June 2021 but was removed again in March 2022.

L.J. was born on February 10, 2021, during his brother's dependency, and was removed from the custody of the mother within days after his birth due to her ongoing substance use and mental health issues. The mother entered into an agreed dependency disposition for L.J. in April 2021. L.J. was eventually returned to the mother's home, contingent on her remaining at Rising Strong, a local drug treatment and housing program, but was removed from her care a second time in April 2022.

In September 2022, the Department of Children, Youth, and Families (Department) filed a petition to terminate the parental rights of the mother for I.L. and L.J.

*Dependency and Treatment History*

During the dependency, the mother's parental deficiencies were identified as chemical dependency with a history of substance abuse and mental health issues with a domestic violence component. To address these deficiencies, the services offered and provided consisted of chemical dependency assessment and treatment, random urinalysis (UA) testing, an evidence-based parenting program assessment with treatment, mental health treatment/individual counseling, and a psychological evaluation with treatment.

At review hearings that occurred between March 2020 and September 2021, the mother was found to be making partial progress toward correcting the deficiencies that necessitated the children's placement in out-of-home care. However, after February 2022, there were no findings that the mother had made any further progress.

During 2019 to 2024, the providers working with the mother included: Grassroots Therapy Group, Absolute Drug Testing, Partners with Families and Children (Partners), Rising Strong, Youth, Family and Adult (YFA) Connections, Revive Housing, Northeast Washington Treatment Association, Discovery Counseling Group, Spokane Addiction Recovery Center (SPARC), Dr. Kenneth Cole, and Stepping Stones Pediatric Therapy. Many of these providers offered substance abuse treatment and/or mental health services.

The mother began mental health treatment with Partners in January 2020. She was diagnosed with post-traumatic stress disorder (PTSD) and established a treatment plan. She completed the intake assessment on January 14, 2020. Furthermore, she attended

three out of four sessions in February 2020, though she was late to most of these appointments. During her time at Partners, the mother participated in cognitive behavioral therapy, which the provider described as very similar to dialectical behavior therapy (DBT). She attended roughly half of her appointments in September, October, and November and missed all sessions scheduled for December. She was ultimately discharged the next year in June 2021 due to inconsistent participation.

Amy Howko, with Family Care Northwest (FCNW), received three referrals to provide the mother with family services in February 2020, September 2020, and January 2021. For her February 2020 referral, the mother was discharged in September 2020 due to lack of engagement. For her September 2020 referral, she was again discharged in November 2020 for the same issue. Her third referral was discharged, in May 2021, for non-participation and lack of engagement. The last discharge was due to the mother's engagement with Rising Strong and her desire to focus on that service.

The mother was also placed at Rising Strong in early 2021. She had one positive UA and despite being offered additional UAs, she denied substance use, refused to provide a UA, and decided to leave. Mental health services continued to be offered to the mother after she left Rising Strong, but her attendance wavered.

Lynn Guinn, the clinical supervisor at YFA Connections, did not directly provide services to the mother but did complete the mother's mental health assessment. The

mother began treatment in September 2021 with a portion of their program, attended only one session in October 2021, and was discharged on October 22, 2021.

The mother was diagnosed with chemical dependency issues and mental health needs and was provided co-occurring treatment—mental health and chemical dependency—with New Horizons Care Center from November 2021 to April 2022. During her mental health treatment with New Horizons, she was actively using controlled substances. Additionally, the mother was diagnosed with depressive disorder, but she needed to address her substance use before dealing with mental health issues because the treatment would not be effective unless she was sober. The mother informed New Horizons she wanted medication management but was informed that it would not be possible with substance use because methamphetamines block certain prescribed medications. The mother did not complete the program at New Horizons.

Grassroots provided services to the mother from August 2021 to November 2022. She completed a family assessment and had goals of developing parenting skills. Grassroots had concerns about the mother's ongoing drug use and discharged her due to lack of engagement.

Jaylene Plaff, with Discovery Counseling Group, provided mental health counseling to the mother. Discovery Counseling Group offered DBT, which the mother was interested in pursuing. The mother completed the intake and started sessions, but she was eventually discharged for lack of attendance. Although Discovery Counseling Group

received a second referral from the Department for services, they were unable to connect with the mother, so she was discharged in January 2023.

SPARC provides mental health counseling, including DBT services, and substance abuse counseling. The mother attended treatment from April 2023 to July 2023. She was diagnosed with borderline personality disorder and substance abuse. Additionally, she was set up for co-occurring treatment. However, after she was suspected of using illicit substances, she refused a request to provide a UA. Immediately following this request, the mother missed several appointments. The mother did not successfully complete treatment through SPARC and continued to use illicit substances.

Nicole Breesnee from Partners provided substance use services to the mother from September to October 2023. After 30 days of sobriety, the mother became eligible for mental health services, but shortly after her services began, she started missing sessions, then stopped attending altogether. Breesnee was unsuccessful in her attempts to get the mother back into treatment.

In September 2023, Doctor Kenneth Cole, a clinical psychologist, completed a psychological evaluation with a parenting component on the mother. He diagnosed the mother as having schizoaffective disorder, PTSD, somatic symptom disorder, methamphetamine use disorder, and borderline personality disorder with dependent personality traits. Dr. Cole recommended a thorough drug and alcohol evaluation and to follow through with all treatment recommendations, group meetings, and abstinence from

any form of substance use. Dr. Cole recommended mental health treatment specializing in personality disorders to help the mother's mood regulation and social difficulties. Additionally, Dr. Cole recommended genotypic testing to assist with medication management. Dr. Cole acknowledged that this is an emergent procedure that considers a person's mutated genes.

*Termination*

The Department filed petitions to terminate the parent-child relationship between the mother and her children in September 2022. The mother's parental deficiencies were identified as chemical dependency with a history of substance abuse and mental health issues with a domestic violence victim component. At the time of the termination trial, I.L. was removed for 658 days and L.J. for 1,068 days.

The case proceeded to trial in January 2024. The trial court heard testimony from 21 witnesses over the span of four days, including the mother, Department social workers, treatment providers at Grassroots, YFA Connections, Partners, Discovery, and SPARC, Dr. Cole, and several others testifying to the facts set forth above.

The mother testified at the hearing about her life, including trauma, chemical dependency issues, and her efforts to overcome them. While acknowledging that one of the parental deficiencies listed in the dependency order was chemical dependency and a history of substance abuse, she testified that "I don't believe that's an issue." Rep. of Proc. (RP) at 53. She also acknowledged that one of the deficiencies listed was mental

health issues and admitted that this was an issue in her life but did not agree that her

mental health was a deficiency. Nevertheless, the mother indicated that the Department

was not taking her mental health seriously because it was not providing active

communication or referrals to places she could call.

The court found by clear, cogent, and convincing evidence that all services

ordered under RCW 13.34.136 had been expressly and understandably offered or

provided. Additionally, all "necessary services capable of correcting [the mother]'s

parental deficiencies within the foreseeable future have been and were expressly and

understandably offered and provided." Clerk's Papers (CP) at 984.

The court noted that after several years, the mother still denied she had substance

abuse issues and, while she was aware of her mental health difficulties, she refused to

follow through with any treatment that would assist her in moving forward to gain her

children back.

The court found that the Department had extreme difficulties in keeping the

mother engaged despite all the services that had been offered to her to help work through

her barriers. Many providers testified that they would tailor a program to fit what the

mother wanted but could not keep her attending. Furthermore, early in the case, the

children were returned to the mother because she had made some progress. However,

I.L. was injured due to the mother's continued toxic relationship with his father and the

8

children were again removed. Since removal, the mother made no significant efforts to repair her parental deficiencies.

Additionally, the court found that the Department made more than reasonable efforts to determine the mother's needs and respond to them. It tried different programs, counselors, and treatment agencies to inspire her to correct the issues that caused her children to be removed. The services that were reasonably available and understandably offered were rejected.

Finally, the trial court found that the services offered—chemical dependency treatment, mental health services, including Eye Movement Desensitization and Reprocessing and DBT—would have corrected her parental deficiencies and allowed reunification with the children. The Department tried numerous agencies hoping that the mother would find one that she could complete. However, she refused to follow through with any of these programs and the deficiencies remained.

The trial court terminated the mother's parental rights, finding that all six statutory factors were met. The mother appeals.

## ANALYSIS

1. CHILDREN'S BRIEF

The children, I.L. and L.J., through their attorney, note that the children are too young to provide a stated interest. They do, however, provide analysis of their legal interests, including their "right to an intact family unit when possible, the right to a

9

healthy, safe and stable home, and the right to permanency and a 'speedy resolution' of dependency and termination proceedings." Children's Br. at 1-2. The children acknowledge these rights and interests but recognize that they lead to conflicting conclusions. Therefore, they do not endorse any specific outcome in this case.

The children do, however, point out that the order terminating the mother's parental rights fails to acknowledge the sibling relationships as required by RCW 13.34.200(3). This provision requires that "[a]n order terminating the parent-child relationship shall include a statement addressing the status of the child's sibling relationships and the nature and extent of sibling placement, contact, or visits." *Id.*

Here, the mother testified that she had four children, and the two other children were not in her care. The termination order acknowledged a half sibling to I.L. and L.J. but did not mention the mother's fourth child.

While the court's termination order failed to fully comply with RCW 13.34.200(3), the error was harmless. As the children's brief notes, the requirement to acknowledge siblings ensures that the relations are considered when deciding on a termination petition, but the failure to address sibling relations in a termination order is not fatal. *In re Dependency of J.D.P.*, 17 Wn. App. 2d 744, 487 P.3d 960 (2021).

2.  CHALLENGED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The mother contends several findings of fact and conclusions of law are not supported by substantial evidence. Each argument is addressed in turn.

*Assignments of Error (AOE) 5B*

The mother argues that the trial court's finding that YFA diagnosed her with schizoaffective disorder is not supported by substantial evidence and the State concedes. We agree with the parties that this finding is not supported.

Despite several mental health evaluations, Dr. Cole was the only provider to diagnose the mother with schizoaffective disorder. However, Dr. Cole acknowledged in his testimony that the mother's recent methamphetamine use could have interfered with her diagnosis.

In its memorandum decision, the trial court found that YFA Connections had diagnosed the mother with schizoaffective disorder. This finding was not repeated in the findings of fact included in the final order on termination. Regardless, the finding that YFA Connections diagnosed the mother with schizoaffective disorder is not supported by substantial evidence.

*AOE 5C*

The mother also challenges the finding that Grassroots worked with the mother from August 2021 to November 2022. The Department contends this assignment of error relates only to the dates of service-provider involvement, but the mother does not discuss the purported errors in her brief. As such, the Department contends we should decline to consider the undeveloped argument. We agree with the mother.

The specific finding the mother challenges, and related assignment of error, concerns the dates that the mother received services from Grassroots. Additionally, the mother devotes a portion of her brief to this challenge. As the mother asserts, the correct dates that Grassroots provided services to the mother were from August to November 2021 rather than November 2022. Consequently, the assignment of error as written is unsupported.

*AOE 5D*

The mother challenges the trial court's finding that she was referred to Circle of Security for treatment byAlison Sandeen from the Department. The Department states that this assignment of error relates to prior involvement of the dependency proceeding and that the mother does not discuss the purported error in her briefing. We agree with the mother.

Based on the record before this court, the mother was asked whether Circle of Security was suggested by her social worker. The mother responded that it was not, but she had asked about it because it was offered at Rising Strong. Additionally, Sandeen did not mention Circle of Security in her testimony. As such, this finding is not supported by substantial evidence.

*AOE 5E, 6B, 6C, 6F*

The mother argues that the evidence does not support a finding that she denies she has substance abuse issues. She contends that she acknowledged substance abuse was

her way of coping with or treating her mental health issues. We disagree with the mother and conclude that substantial evidence supports these findings.

The mother specifically testified that she did not believe chemical dependency was the issue for her. Further, she explained that chemical dependency treatment was not something that she would seek to do or ever intended to do. Instead, she asserted that her issues were mental health related, including the need to properly cope with trauma, and triggers for her PTSD. Although the mother believed her substance abuse issues were secondary to her mental health struggles, she asserted several times that she did not believe chemical dependency was the issue for her. This finding is thus supported by substantial evidence.

*AOE 6E*

The mother contends substantial evidence does not support the trial court's finding that Meredith Hipperson provides DPT services. Instead, she states the testimony demonstrated that some counselors at Hipperson's agency provide DBT but did not specify which ones. This finding is not supported by substantial evidence.

Ms. Hipperson was asked whether SPARC offers DBT therapy to which she responded "[n]ot a group, but *some of the counselors* will incorporate it into their work." RP at 185 (emphasis added). Although this demonstrates that some of the counselors at SPARC provided DBT therapy, Hipperson's testimony did not indicate or specify that she provided those services. Consequently, this finding is unsupported.

*AOE 6H*

The mother contends that substantial evidence does not support the finding that she testified social workers went above and beyond to assist her. Instead, she asserts that she noted her dissatisfaction with multiple social workers.

Although the mother explained her dissatisfaction with some social workers, she testified to her satisfaction with several others. For example, she testified that she had social workers who would discuss with her ways to overcome her struggles and would get down to a "human level" with her. This made them relatable, helpful, and the mother explained "very motivated to keep [her and her] family together." RP at 206. The mother also expressed her satisfaction with several other social workers that worked with her during her dependency. Although the mother expressed dissatisfaction with many social workers, there was also evidence of her satisfaction with others. As such, this finding is supported by substantial evidence.

*AOE 5G*

Finally, the mother contends that substantial evidence does not support the trial court's finding that her parental deficiencies prevent her from providing basics such as health, safety, and nurturing for her children. In doing so, she asserts that Ms. Sandeen testified that the mother does not typically struggle in her capacity as a parent. Substantial evidence supports this finding.

Dr. Cole's psychological report specifically notes that the mother's mental health disabilities are likely to negatively affect her parenting decisions due to impulsivity, impaired decision-making skills, poor executive functioning, anti-social attitudes, and difficulty regulating emotions and behavior. For these reasons, Dr. Cole opined that the mother's mental health challenges would likely make child-centered decisions very difficult and that did not meet the children's needs to develop physically and psychologically in a healthy and safe environment. Furthermore, although Dr. Cole determined she was capable of adequate parenting for at least a brief period, he felt it was highly likely she would have significant difficulty consistently maintaining an environment conducive to the physical and psychological needs of her children.

Although we conclude that several findings of fact are unsupported by substantial evidence, the errors are harmless because they do not impact the ultimate conclusion that the Department provided the mother with necessary services as set forth below. *See In re Welfare of C.B.*, 134 Wn. App. 336, 347, 139 P.3d 1119 (2006).

3. ORDERED AND NECESSARY SERVICES

The mother contends that the Department failed to provide timely mental health services, asserting that essential services, such as a psychological evaluation and tailored mental health treatment, were delayed to the detriment of reunification prospects. Specifically, she contends that a psychological evaluation was not performed until less than four months prior to trial despite early indications that the mother had complex

mental health needs requiring more specialized attention. She points out Dr. Cole

provided a new diagnosis of schizoaffective disorder and recommended DBT treatment

by a qualified mental health professional and contends such services were never offered

or provided.

The Department responds that it offered necessary mental health services, but it

was the mother's refusal to engage in treatment that accounts for the outcome. The

Department points out that the mother was offered a psychological evaluation on two

previous occasions during dependency proceedings, but she refused to participate. While

the Department acknowledges that Dr. Cole's psychological evaluation resulted in a new

diagnosis of schizoaffective disorder, it maintains that Dr. Cole's treatment

recommendations did not substantively differ from the services that had already been

offered or provided to the mother.

*A. Standard of Review*

As an appellate court, our role in reviewing a trial court's decision to terminate

parental rights is to "determine whether substantial evidence supports the trial court's

findings of fact by clear, cogent, and convincing evidence." *In re Dependency of M.L.W.*,

28 Wn. App. 2d 252, 260, 535 P.3d 491 (2023); *In re Parental Rights of K.M.M.*, 186

Wn.2d 466, 477, 379 P.3d 75 (2016). Evidence is considered substantial "if, when

viewed in the light most favorable to the prevailing party," which here, is the

Department, "it is such that a rational trier of fact could find the fact in question by a

preponderance of the evidence." *M.L.W.*, 28 Wn. App. 2d at 260. Deference to the trial

court is particularly important because termination proceedings are highly fact specific.

*Id*. As such, we will defer to the trial court for "witness credibility and persuasiveness of

the evidence" unless they are not supported by "clear, cogent, and convincing evidence."

*Id*. at 260-61.

   B. *Termination of Parental Rights and Necessary Services*

RCW 13.34.180 sets forth six statutory factors that must be demonstrated by clear,

cogent, and convincing evidence when terminating a parent's rights. *In re Dependency of*

*A.N.C.*, 24 Wn. App. 2d 408, 414-15, 520 P.3d 500 (2022). Under those standards, and

relevant to this appeal, are that "services ordered under RCW 13.34.136 have been

expressly and understandably offered or provided and all *necessary services*, reasonably

available, capable of correcting the parental deficiencies within the foreseeable future

have been expressly and understandably offered or provided." RCW 13.34.180(1)(d)

(emphasis added).

Services that are necessary and services that are ordered are not always

synonymous; a court may determine that services are necessary even if they have not

been ordered. *In re Parental Rights of I.M.-M.*, 196 Wn. App. 914, 921, 385 P.3d 268

(2016). Necessary services are those services that are "needed to address a condition that

precludes reunification of the parent[s] and child." *A.N.C.*, 24 Wn. App. 2d at 416. The

services must "be tailored to the parent's needs" because "parents face different

17

challenges and require different assistance." *Id*. If, however, "it is determined that the efforts to cure parental deficiencies have been unsuccessful and additional services will not remedy those deficiencies in the foreseeable future, . . . a termination petition [will] be filed." *In re Dependency of A.W*., 53 Wn. App. 22, 28, 765 P.2d 307 (1988).

### C.  Mental Health Treatment

The mother contends that the court erred in finding that all ordered services and all necessary services reasonably available and capable of correcting her parental deficiencies were expressly and understandably offered or provided. More specifically, she argues that the psychological evaluation was untimely, and the mental health services offered to the mother were not tailored to meet her specific needs.

Among other requirements, the mother was ordered to complete a chemical dependency assessment, participate in random urinalysis testing, engage in individual counseling with a domestic violence component, and follow any recommendations made by the service providers.

We begin by noting that the court did not order the mother to participate in a psychological assessment. Nor did the court find that a psychological assessment was a necessary service. Nevertheless, the record demonstrates that a psychological evaluation was discussed with the mother on two prior occasions: first in 2021 when her dependency with I.L. began, and second, in the beginning of 2023, but the mother refused to engage.

18

As such, the mother's argument that she did not timely receive the recommendation for a psychological evaluation fails.

We also reject the mother's contention that the DBT recommended by Dr. Cole had not been provided in a manner specifically tailored to her needs. The court found that DBT had been offered to the mother. Moreover, many of these providers had attempted to tailor programs to fit what the mother wanted but despite these efforts, the mother refused to engage. Significant evidence supports these findings.[1]

At the termination hearing, the mother was specifically asked whether she had been offered DBT through a Department referral. Despite answering no, she informed the court that she had DBT at Rising Strong because it was required. She explained that she participated in groups and graduated from the mindfulness and emotional regulation part before she left. Furthermore, because she "already graduated the first two," she stated she would only need the third part of DBT.

Pam Brown, the vice-president of behavioral health services at Catholic Charities, also affirmed that the mother received DBT. She explained that the mother participated in and attended group sessions of DBT while at Rising Strong. Additionally, she testified

---

[1] Findings of fact are determinations of "whether the evidence show[s] that something occurred or existed" while conclusions of law are determinations "made by a process of legal reasoning from . . . the evidentiary facts." *Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc.*, 21 Wn. App. 194, 197 n.5, 584 P.2d 968 (1978). Where a conclusion of law is mislabeled as a finding of fact, this court reviews it as a conclusion of law. *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

19

that DBT is generally once a week and lasts about a year, so most residents stay for a year or longer to get through the entire series. However, the mother was discharged in June of 2021 and was therefore only able to complete 11 sessions.

The mother next received mental health and chemical dependency services through New Horizons that began in December 2021. Patricia Shropshire, a clinic supervisor who works at New Horizons, testified. She explained that the clinicians at New Horizons were able to offer DBT and that the mother did receive DBT during her time there before her discharge in June 2022. However, on cross-examination, Shropshire clarified that the therapy was not certified DBT but what was provided required the mother to practice "mindfulness and DBT homework per se to help with her emotional regulations." RP at 240.

Jaylene Pfaff, a behavioral therapist at Discovery Counseling Group, testified that DBT is utilized at their facility. Pfaff explained that, while treating the mother, she offered DBT and cognitive processing therapy techniques. The mother completed the intake and started classes but was eventually discharged for non-attendance. Discovery received a second referral for her and attempted to reengage, but they were unable to connect with the mother, and she was again discharged in January 2023.

In July 2023, the mother was referred to treatment at SPARC. While not as a group, some of the counselors would incorporate DBT into their sessions. The mother was set up for co-occurring treatment and individual therapy but after it was suspected

20

the mother was using, she refused a UA, missed several appointments, and then stopped attending.

The mother next argues that prior to Dr. Cole's psychological evaluation, it was unknown that she had schizoaffective disorder. While this may be true, the treatment recommended for the diagnosis was DBT training by an experienced mental health provider. The trial found that the services offered to the mother, including DBT, would have corrected her parental deficiencies, but the mother refused to follow through with any of the programs offered.

The mother contends that Dr. Cole recommended group or individual DBT by a qualified mental health professional, which she asserts was not provided. The mother's argument rests on the premise that a qualified mental health provider equates to a "certified" DBT provider. However, the mother did not raise this argument below and the record does not demonstrate that a qualified mental health professional specializing in personality disorders equates to the need for certification in DBT. Although the mother asked whether one of the providers was aware they could become DBT certified in Washington, she failed to demonstrate it was required. Consequently, this argument fails.

Next, the mother asserts that she was not provided medication management based on genotypic testing as recommended by Dr. Cole. This argument fails because the mother was provided with medication management and genotypic testing was not found to be a necessary service. The record demonstrates that the Department provided support

for medication management. For example, the mother engaged in medication management during her time at New Horizons. Likewise, the Department offered a standing referral for medication management with a nurse practitioner after she was discharged from New Horizons, but the mother did not engage.

Additionally, the mother's continued substance use impacted whether some providers were able to provide medication because methamphetamine use affects portions of the brain that would not allow certain medications to work effectively. Furthermore, the Department attempted to set the mother up with a counselor that could provide medication management, but a UA was needed to engage with this provider and the mother had trouble doing UAs and refused alternative forms of testing.

Finally, the mother contends that, had appropriately timed mental health treatment been provided, she would have been successful in reunification with her children. She grounds this assertion on her partial compliance in 2021. The record does not support this argument. Instead, the record demonstrates that the Department made a concerted but ultimately an unsuccessful effort to persuade the mother to participate in all court-ordered and necessary services from 2021 to the termination hearing, as set forth above.

Substantial evidence supports the trial court's finding that the mother was expressly and understandably provided all court ordered services and all necessary services reasonably available and capable of correcting the mother's parental

No. 40423-4-III
*In re Dependency of L.J.*

deficiencies, and these services were tailored to the mother's individual circumstances and provided in a timely manner.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, A.C.J.

WE CONCUR:

_____
Murphy, J.

_____
Cooney, J.

23